UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. CHARLES F. PARADISE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 1:13-cv-11070-DJC |
| v. | ) | |
| | ) | |
| MASSACHUSETTS GENERAL HOSPITAL, | ) | |
| MASSACHUSETTS GENERAL | ) | |
| PHYSICIANS ORGANIZATION, INC., and | ) | |
| MGH OPTIMUM CARE COMMITTEE, | ) | |
| | ) | |
| Defendants | ) | |

## FIRST AMENDED COMPLAINT

### NATURE OF ACTION

1. The Defendants have failed to provide adequate care for the medically fragile and vulnerable elderly patients admitted to the Massachusetts General Hospital, resulting in egregious harm and even death to some of those patients. In the process, Defendants have defrauded the United States by seeking and receiving substantial reimbursement from the Medicare program for care purportedly provided to those patients, despite knowing that "care" was either non-existent or so inadequate as to be worthless.

2. The United States of America, by its Relator Charles F. Paradise, who brings this qui tam action for himself as well for the Government, against the Defendants, jointly and severally, for damages under the False Claims Act, 31 U.S.C. § 3729-3733, the common law theory of fraud, and the common law or equitable theory of unjust enrichment. In support thereof, the United States alleges as follows.

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a) and the False Claims Act, 31 USC §§ 3730 and 3732.

4.   The allegations of this complaint have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

5.   The Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act.

6.   The Relator provided disclosure of the material evidence and original source information upon which this complaint is based to the Government prior to filing.

7.   Venue is proper in this district under 28 USC §§ 1391 and 1395(a), and 31 USC § 3732(a) because the acts alleged in this Complaint occurred in the Eastern Division and the acts proscribed by 31 USC § 3729 occurred in the Eastern Division of the District of Massachusetts.

8.   This Court has personal jurisdiction over each Defendant based upon the transaction of business within this judicial district.

## PARTIES

9.   The United States of America is a real party in interest to the qui tam claims set forth herein.

10.   The Relator, Charles F. Paradise, is a citizen and resident of Concord, Massachusetts.

11.   The United States brings this action to recover losses incurred by its agency, the Department of Health and Human Services (HHS), and its operating division, the Centers for Medicare & Medicaid Services (CMS). HHS provides funding for, and regulates payment and participation of hospitals and physicians in the Medicare program.

12.   Defendant Massachusetts General Hospital (MGH) is a corporation that was incorporated in Massachusetts in 1811. MGH does business as a hospital and has submitted claims for reimbursement to Medicare. At all material times, MGH as

an organization was assigned Medicare provider number 1992926992 and CMS certification number 220071; its name appears on a total of 28 billing units with assigned Medicare provider numbers.

13. Defendant Massachusetts General Physicians Organization, Inc. (MGPO) is a nonprofit corporation that was incorporated in Massachusetts in 1983. MGPO does business as a medical services supplier and has submitted claims for reimbursement to Medicare. At all material times, MGPO as an organization was assigned Medicare provider number 1306186523; its name appears on a total of 6 billing units with assigned Medicare provider numbers.

14. Defendant MGH Optimum Care Committee (OCC) is an unincorporated association whose members are described online as interdisciplinary, including physicians, nurses, social workers, chaplains, rehabilitation professionals, respiratory therapists and community members. At all material times OCC has exercised direct and indirect control of administrative and medical decisions concerning critical care of patients.

## SUMMARY OF ALLEGATIONS

15. From 1990 until the present (hereinafter the "relevant period"), Defendants MGH, MGPO and OCC submitted or caused to be submitted false or fraudulent claims to the Medicare program for services that were worthless, in that they were not provided or rendered, were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the patients of MGH, were of a quality that failed to meet professionally recognized standards of health care, and deprived the patients of MGH of constitutionally protected rights to petition, due process, and life, liberty, and property (hereinafter "fraudulent claims").

16. During the relevant period, Defendants caused egregious patient harm, abuse and neglect, and grossly deficient medical treatment at MGH. During the relevant period, Defendants knowingly failed to make or record adequate determinations of advance directives, disclosures of their policies and procedures, disclosures of their intent to withhold or withdraw treatment, and meaningful participation in and assistance with grievance procedures concerning MGH patients. During the

relevant period, Defendants knowingly directed and approved of the billings by MGH and MGPO to the Medicare program, and knowingly accepted and approved of the receipt by MGH and MGPO of Medicare funds, despite knowing that the services provided to MGH patients were so deficient or inadequate as to be worthless.

17. During the relevant period, Defendants perpetrated a fraud on the United States by making materially false representations in the submission of Medicare claims.

18. All of the Defendants were unjustly enriched by the improper payments from the Medicare program. All of the Defendants should be required to account for and disgorge their unlawful profits.

## MEDICARE REIMBURSEMENT

19. Through Medicare, the United States pays for certain medical care for the elderly and the disabled.

20. At all relevant times, HHS, through CMS, administered the Medicare program.

21. In administering the Medicare program, CMS retains private insurance companies to act as fiscal intermediaries or agents of CMS and, pursuant to written agreements, make payments on behalf of the program's beneficiaries.

22. Various fiscal intermediaries processed claims that were submitted by Defendants for medical care purportedly provided at MGH.

23. Medicare Part A paid Defendants under the prospective payment system. Under this system, an acute inpatient hospital is required to classify its patients into one of originally 467 diagnosis-related groups ("DRG"), based on certain factors that are assessed for each patient. This DRG, in turn, is factored into wage and non-wage reimbursement provided by Medicare to the hospital.

24. Medicare Part B paid Defendants for doctors' services and certain outpatient services such as x-rays.

## MEDICARE LEGAL AND REGULATORY FRAMEWORK

25. Statutes and regulations governing the Medicare program require health care providers to maintain – as a prerequisite to receiving payment under the programs

– substantial compliance with all the pertinent rules and regulations governing the programs.

26. Among other things, health care providers must assure that all services for which they submit claims for Medicare payment are "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(A)(2).

27. In 1965, Congress created the Medicare program as part of the Social Security Act to provide health insurance to people age 65 and older, regardless of income or medical history. 42 U.S.C. §§ 1395 *et seq*. ("Medicare statute"). Over the years, Congress expanded Medicare eligibility to cover certain disabilities and diseases in younger people and to provide hospice benefits.

28. A hospital is defined in the Medicare statute at 42 U.S.C. § 1395x(e) as an institution which:

> (1) is primarily engaged in providing, by or under the supervision of physicians, to inpatients
>> (A) diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons, or
>> (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;
>
> (2) maintains clinical records on all patients;
> (3) has bylaws in effect with respect to its staff of physicians;
> (4) has a requirement that every patient with respect to whom payment may be made under this subchapter must be under the care of a physician …;
> (5) provides 24-hour nursing service …
> (6)
>> (A) has in effect a hospital utilization review plan …
>> (B) has in place a discharge planning process that meets the requirements of subsection (ee) of this section;
>
> (7) in the case of an institution in any State in which State or applicable local law provides for the licensing of hospitals,
>> (A) is licensed pursuant to such law or
>> (B) is approved, by the agency of such State or locality responsible for licensing hospitals, as meeting the standards established for such licensing;
>
> (8) has in effect an overall plan and budget  … and
> (9) meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution.

29. MGH is a hospital as that term is defined by the Medicare statute .

30. A supplier is defined in the Medicare statute at 42 U.S.C. § 1395x(d) as a physician or other practitioner, a facility, or other entity (other than a provider of services) that furnishes items or services under the Medicare subchapter.

31. MGPO is a supplier as that term is defined by the Medicare statute.

32. To establish eligibility for participation in Medicare, a hospital may submit certification of accreditation. 42 C.F.R. Part 488. MGH maintains continuing certification by The Joint Commission, formerly known as The Joint Commission on Accreditation of Healthcare Organizations. The Joint Commission requires hospitals to have a mechanism for addressing ethical issues in providing patient care, and it recommends a multidisciplinary ethics committee. On information and belief, the OCC is such a committee.

33. OCC is a provider of services as that term is defined by the Medicare statute.

34. The Medicare statute mandates that payment for services furnished an individual may be made only if a physician certifies that the services are required to be given on an inpatient basis for the individual's medical treatment and are necessary for the purpose and no finding has been made by a utilization review committee or group that further services are not medically necessary. 42 U.S. Code § 1395f(a).

35. A hospital must protect and promote each patient's rights. 42 C.F.R. § 482.13.

> (a) A hospital must inform each patient, or when appropriate, the patient's representative (as allowed under State law), of the patient's rights, in advance of furnishing or discontinuing patient care whenever possible. The hospital must establish a process for prompt resolution of patient grievances and must inform each patient whom to contact to file a grievance. At a minimum:
>  (i) The hospital must establish a clearly explained procedure for the submission of a patient's written or verbal grievance to the hospital.
>
>  (ii) The grievance process must specify time frames for review of the grievance and the provision of a response.
>
>  (iii) In its resolution of the grievance, the hospital must provide the patient with written notice of its decision that contains the name of the hospital contact person, the steps taken on behalf of the patient to investigate the grievance, the results of the grievance process, and the date of completion.
>
> (b) Standard: Exercise of rights. (1) The patient has the right to participate in the development and implementation of his or her plan of care.

(2) The patient or his or her representative (as allowed under State law) has the right to make informed decisions regarding his or her care. The patient's rights include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment. This right must not be construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate.

(3) The patient has the right to formulate advance directives and to have hospital staff and practitioners who provide care in the hospital comply with these directives.

36. Patient rights are provided by State law. 111 GLM 70E.

Every patient or resident of a facility shall have the right …

(c) to have all reasonable requests responded to promptly and adequately within the capacity of the facility;
…
(*l*) to informed consent to the extent provided by law;

Every patient or resident of a facility shall be provided by the physician in the facility the right:

(a) to informed consent to the extent provided by law;

37. According to the ancient Hippocratic oath sworn by Apollo, a physician must protect and promote each patient's rights. "I will use those dietary regimens which will benefit my patients according to my greatest ability and judgement and I will do no harm or injustice to them."

38. By regulation, 42 C.F.R. § 482.24, all patient medical records must document:

(iv) Documentation of complications, hospital acquired infections, and unfavorable reactions to drugs and anesthesia.
(v) Properly executed informed consent forms for procedures and treatments specified by the medical staff, or by Federal or State law if applicable, to require written patient consent.

39. Compliance with the Patient Self-Determination Act is a Medicare condition of payment for hospitals. 42 U.S. Code § 1395cc(a)(1)(Q).

40. The Patient Self-Determination Act, 42 U.S.C. § 1395cc(f), incorporating State law, provides in relevant part:

(1) [As a condition of payment], the requirement of this subsection is that a provider of services [shall] maintain written policies and procedures with

respect to all adult individuals receiving medical care by or through the provider …—

(A) to provide written information to each such individual concerning—

(i) an individual's rights under State law (whether statutory or as recognized by the courts of the State) to make decisions concerning such medical care, including the right to accept or refuse medical or surgical treatment and the right to formulate advance directives (as defined in paragraph (3)), and

(ii) the written policies of the provider or organization respecting the implementation of such rights;

(B) to document in a prominent part of the individual's current medical record whether or not the individual has executed an advance directive;

(C) not to condition the provision of care or otherwise discriminate against an individual based on whether or not the individual has executed an advance directive;

(D) to ensure compliance with requirements of State law (whether statutory or as recognized by the courts of the State) respecting advance directives at facilities of the provider or organization; and

(E) to provide (individually or with others) for education for staff and the community on issues concerning advance directives.

Subparagraph (C) shall not be construed as requiring the provision of care which conflicts with an advance directive.

(2) The written information described in paragraph (1)(A) shall be provided to an adult individual—

(A) in the case of a hospital, at the time of the individual's admission as an inpatient ….

(3) In this subsection, the term "advance directive" means a written instruction, such as a living will or durable power of attorney for health care, recognized under State law (whether statutory or as recognized by the courts of the State) and relating to the provision of such care when the individual is incapacitated.

41. In Massachusetts, the term "advance directive" means a designation of a health care agent in a health care proxy pursuant to Mass. Gen. Laws ch. 201D.

42. A health care agent has the authority to make any and all health care decisions on the patient's behalf that the patient could make, including decisions about life-sustaining treatment. *Id.*, § 5. The only exception is for physicians and hospitals objecting in a formally adopted policy expressly on religious grounds and provided to the patient or health care agent prior to or upon admission. *Id.*, §§ 14 & 15.

43. A dispute may arise when a patient requests the provision of treatment or services deemed medically unnecessary or inappropriate by the hospital or physician. Congress lacks the power to delegate life and death decisions to unsupervised private parties, even physicians. U.S. Const., amend. V & XIV.

44. To determine the validity of a health care proxy, remove the agent, or override the agent's decision, Massachusetts law provides the right to commence a special proceeding in a court of competent jurisdiction such as the Probate and Family Court division of the Trial Court. Mass. Gen. Laws, ch. 201D, § 17.

45. In Massachusetts, "we reject the approach adopted by the New Jersey Supreme Court in the *Quinlan* case of entrusting the decision whether to continue artificial life support to the patient's guardian, family, attending doctors, and hospital 'ethics committees.'" *Superintendent of Belchertown State School v. Saikewicz,* 373 MA 728, 758 (1977) (footnote omitted).

> We do not view the judicial resolution of this most difficult and awesome question — whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision — as constituting a 'gratuitous encroachment' on the domain of medical expertise. Rather, such questions of life and death seem to us to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created. Achieving this ideal is our responsibility and that of the lower court, and is not to be entrusted to any other group purporting to represent the "morality and conscience of our society," no matter how highly motivated or impressively constituted.

At 759.

46. Where a constitutionally protected interest of the patient such as life, liberty, or property hangs in the balance, the Courts have required the government to continue benefits until after notice and an evidentiary hearing. *Goldberg v. Kelly,*

397 US 254 (1970) (termination of welfare payments requires pretermination notice and hearing).

47. When the protected interest is life and the claimed benefit is Medicare payment for life support, time is of the essence.

## MEDICARE PROVIDER AGREEMENTS

48. At all relevant times, MGH and MGPO had the status of "provider" with written agreements with the Medicare program.

49. In their Medicare provider agreements, as a prerequisite to enrolling in and receiving payment from the Medicare program, MGH and MGPO expressly certified the following:

> "I am familiar with and agree to abide by the Medicare or other federal health care program laws, regulations and program instructions that apply to my provider/supplier type. . . . I understand that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program."

50. Upon information and belief, in addition to the provider agreements, MGH and MGPO also completed an Electronic Data Interchange ("EDI") Enrollment Form in order to bill Medicare electronically.

51. In the EDI Enrollment Form, the provider agrees to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and that it would "submit claims that are accurate, complete and truthful."

52. Through the EDI Enrollment Form, the provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

53. MGH and MGPO submitted their claims for payment to Medicare electronically on a form known as a "UB-92 HCFA-1450" (between July 1, 2004 and May

10

2007) or a "UB-04 CMS-1450" (after May 2007). The 1450 forms, which are substantively identical, contain various certifications on their reverse side, including the certification that "This claim, to the best of my knowledge, is correct and complete . . . ."

54. Each year MGH and MGPO are required to submit an annual cost report to a fiscal intermediary. The signature page of the cost report (which is typically submitted about six months after the end of the year at issue) requires the signing officer to certify that "I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." The signer must also certify familiarity with the statement that "misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law."

55. In order to qualify for Medicare payments, a provider must sign a Health Insurance Benefit Agreement, Form CMS-1561 ("CMS-1561). 42 U.S.C. § 1395cc. Through the CMS-1561, a provider expressly agrees to conform with the applicable Code of Federal Regulations within Title 42, including the standard of care regulations that implement hospital standards, 42 C.F.R. § 482, as a pre-requisite to payment. The following language of the Health Insurance Benefit Agreement expressly makes compliance with Federal regulations a pre-requisite for payment:

> In order to receive payment under title XVIII of the Social Security Act [42 U.S.C. § 1395cc], [Name of the provider inserted here] as the provider of services, agrees to conform to the provisions of section of [sic] 1866 of the Social Security Act and applicable provisions in 42 CFR [which includes the regulations on quality of care].
> (Emphasis added).

56. As a result of the representations made in their Medicare and Medicaid provider agreements, including its certifications of present and future compliance with applicable federal health care laws, and the certifications made in its annual cost reports, MGH and MGPO were permitted to participate in those programs. That

participation resulted in Medicare payments alone to MGH of $425 million for its FY 2010.

**DEFENDANTS' FAILURE TO CARE FOR THEIR ELDERLY PATIENTS**

57. Throughout the relevant time period, Defendants failed to provide adequate care to the elderly and vulnerable patients of MGH.

58. The following claims for payment for the patient set forth below were submitted, or caused to be submitted, by the Defendants to Medicare.

59. Other false claims for payment for other patients that are not specifically set forth in the paragraphs below were also submitted or caused to be submitted by the Defendants to Medicare.

60. The claims were false and fraudulent because the services purportedly provided were so lacking in quality as to be essentially worthless, in that they (i) were not provided or rendered at all, (ii) were deficient, inadequate and substandard when provided, (iii) did not promote the maintenance or enhancement of the quality of life of the patients of MGH and MGPO, (iv) were of a quality that failed to meet professionally recognized standards of care, and (v) were provided so as to deprive patient rights guaranteed by the United States Constitution, federal and State law, and applicable regulations for notice, participation in care decisions, and grievance procedures.

**Ruth C. Paradise**

61. Ruth C. Paradise was admitted to MGH from the Emergency Department on April 4, 2007. Her intake nursing record states she may have mild dementia. Her admission note states she is alert but disoriented.

62. After one day unable to eat, she took food by mouth for the next ten days. However, her record states she suffered from inadequate protein and total energy intake. Her pneumonia was treated with antibiotics.

63. On the third day, she was inappropriately transferred and wounded by tearing a large extent of the skin on her upper arm. Her skin was very fragile due to 10 years of chronic administration of prednisone. A serious wound from improper

transfer was completely foreseeable. As a direct consequence, she immediately required a transfusion of two units of blood.

64. On the seventh day, a first care team meeting was convened by the attending physician after the aspiration event. The physician suggested considering hospice and requested authorization to enter a "do not resuscitate" order. The agent refused to consent to DNR but agreed to meet and the next day did meet with a resident physician for a detailed explanation of the possible harms to the patient from aggressive cardiopulmonary resuscitation. The care team refused her agent's request for tube feeding saying there was an undue risk of aspiration. The care team failed to note or disclose the existence of a third common method for nutrition, total parenteral nutrition (TPN), or intravenous feeding. The agent discovered the possibility during independent research after the meeting.

65. On the tenth day, she suffered an aspiration event while eating, which sent septic vomitus into her lungs.

66. On the eleventh day, an attempt to place an intravenous PICC line at bedside was unsuccessful. (A PICC line is a a peripherally inserted central catheter. It is long, slender, small, flexible tube that is inserted into a peripheral vein, typically in the upper arm, and advanced until the catheter tip terminates in a large vein in the chest.)

67. On the twelfth day, a second care team meeting was convened by the attending physician. The agent attended the second care team meeting and requested nutritional support by TPN.

68. On the thirteenth day, a PICC line was placed by a surgeon. TPN was started.

69. On the fourteenth day, TPN was stopped. The attending physician stated to the agent that enteral feeding would begin the next day. It did not. The patient was not provided with nutrition thereafter.

70. On the fifteenth day, a representative of the OCC placed a note in the patient record, "cannot be fed enterally or parenterally." Withholding of nutrition was authorized by the attending physician in the next succeeding note on the same page. The burn care unit noted, "Optimize nutrition as you are (with TPN if

necessary).” A DNR was placed in the medical record over the agent's objection. The patient was not provided with nutrition thereafter.

71. On the twentieth day, the day of discharge, her record states she was somnolent but arousable and will answer questions appropriately.

72. On admission, her son and designated health care proxy, the Relator, Charles F. Paradise, provided a list of medications and offered a history of the past four years of his full time responsibility for her care. He informed the intake nurse that when awake, Ruth would like a hospital chaplain or clergy to visit her, but none ever did. He was not provided with notice of policies and procedures in general or specifically as to consequences of a finding of medical futility. No note, prominent or otherwise, was made of his designation as Ruth's health care proxy, nor was a copy taken and placed in the record as required by Massachusetts law.

73. No notice was given to her proxy that nutrition had been withheld.

74. In the 16 days Ruth was admitted to MGH, she was conscious on eight days and not conscious on eight other days in the middle. The OCC representative wrote in her medical record that she suffered from permanent loss of consciousness.

75. At no time from admission to discharge was a finding of brain death, permanent loss of consciousness (except by an OCC representative), or terminal illness entered into Ruth's medical record.

76. At no time from admission to discharge did the Defendants provide Ruth's agent with information on the election of hospice benefits.

77. The MGH physicians of record in Ruth's care from April 4, 2007 to April 20, 2007 included, without limitation, the following:

Attending:
Cilmi, Salvatore #27582
Stone, [first name unknown]
Bigelow Team A
Cooper Worobey, Cynthia #34731 aka Cooper, Cynthia

Juniors (Residents):
Beatty, Alexis L.
Murphy, Janet

Others:
Batista, Daisy D. #12857

Brendel, Rebecca Weintraub #37012
Chae, Claudia U.
Deluca, Salvatore A.
Greene, Reginald E.
Gross, Anne F.
Hayes, Frances J. #22180
Martin, Nicole #12902
Noble, Vicki E.
Pratt, Janey S.
Samir, Anthony
Schaefer, Pamela W.
Sharma, Amita
Waltman, Arthur C.

78. On April 20, 2007 Ruth was transferred to St. Elizabeth's Hospital, where she awoke again. Her medical record states she was alert and answering appropriately. She was provided with food by mouth and by artificial means. She died on May 8, 2007.

79. For the care purportedly provided to Ruth from April 4, 2007 to April 20, 2007, Defendant MGH submitted electronic claims for payment to Medicare, and on information and belief Medicare paid claims totaling $9,000.00.

80. For the care purportedly provided to Ruth from April 4, 2007 to April 20, 2007, Defendant MGPO submitted electronic claims for payment to Medicare, and Medicare paid claims totaling $1,025.05.

## Other Patients

81. The substandard, inadequate and/or non-existent care rendered to Ruth Paradise was the result of a routine practice of business.

82. Upon information and belief, consistent with this pattern of inadequate care, MGH and MGPO regularly submitted or caused to be submitted claims for reimbursements from Medicare for similar worthless services rendered to numerous presently-unidentified residents.

83. Defendants knew that the services for which MGH and MGPO billed Medicare were not provided or rendered, or were so deficient, inadequate and substandard as to be worthless.

## CLAIMS AGAINST DEFENDANTS

### Count I: False Claims Act, 31 U.S.C. § 3729(a)(1)

84. The United States restates and incorporates by reference paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85. By virtue of the acts described above, and as specifically set forth in paragraphs 1 through 83, Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval by Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended.

86. The Defendants represented that the claims were true and correct and that the services identified in the claims were provided in compliance with applicable laws and regulations.

87. However, the claims were false in that they were submitted for services that were essentially worthless, inasmuch as they were not rendered or were deficient, inadequate, substandard, did not promote the maintenance or enhancement of the health of the patient, failed to meet professionally recognized standards of health care, and deprived patients of constitutionally protected rights.

88. Pursuant to the False Claims Act, Defendants are liable to the United States for statutory damages as allowed by law and civil penalties for each of these false or fraudulent claims in an amount to be determined at trial.

### Count II: Common Law Fraud

89. The United States restates and incorporates by reference paragraphs 1 through 83 of the Complaint as if fully set forth herein.

90. The Defendants submitted claims for reimbursement for care purportedly provided to patients of MGH to the Medicare program, or their agents and fiscal intermediaries, for services that were not rendered or were deficient, inadequate, substandard, did not promote the maintenance or enhancement of the quality of life of those patients, were of a quality that failed to meet professionally recognized standards of health care, deprived the patients of protected rights, and were worthless. The Defendants represented that the claims were true and correct

16

and that the services identified in the claim were provided in compliance with applicable laws and regulations.

91. As a result, the United States is entitled to compensatory damages consisting of the total amount paid by Medicare for the fraudulent claims, plus interest, and other compensatory and punitive damages to be determined at trial.

## Count III: Unjust Enrichment

92. The United States restates and incorporates by reference paragraphs 1 through 83 of the Complaint as if fully set forth herein.

93. During the relevant period, Defendants received and retained the benefit of federal monies paid from the Medicare program and intended to reimburse Defendants for care provided to MGH patients, including but not limited to the patient specifically identified in paragraphs 61 through 80.

94. The care and services for which the Medicare program paid Defendants were not rendered or were deficient, inadequate, substandard, did not promote the maintenance or enhancement of the quality of life of those patients, were of a quality that failed to meet professionally recognized standards of health care, deprived the patients of protected rights, and were worthless.

95. In light of the failure of care at MGH, Defendants have been unjustly enriched with federal monies from the Medicare programs which they should not in good conscience be permitted to retain. The amount of those monies is to be determined at trial.

## CLAIM FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, demands judgment against Defendants as follows:

a. With respect to Count I brought pursuant to the False Claims Act, joint and several judgment against the Defendants and in favor of the United States, and a determination by the Court for an appropriate award of statutory damages allowed by law, specifically including treble damages, plus civil penalties of $5,500 to $11,000 for each of the false claims presented or caused to be presented;

b. With respect to Count II, judgment against the Defendants and in favor of the

United States for the amounts paid by Medicare for all erroneous, inflated or improper claims that were obtained by or resulted from the Defendants' fraudulent scheme during the relevant period, plus punitive damages;

c.   With respect to Count III, a judgment in equity against Defendants for the amount by which the Defendants were unjustly and unlawfully enriched; and

d.   With respect to each Count, interest, attorney's fees and costs as allowed by law, and any and all further relief as the Court deems just and proper.

e.   That in the event that the United States Government intervenes and proceeds with the action, the Relator be awarded 25% of the proceeds of the action and any alternate remedy such as administrative civil money penalty, criminal restitution, or settlement;

f.   That in the event that the United States Government does not proceed with the action, the Relator be awarded 30% of the proceeds of the action and any alternate remedy such as administrative civil money penalty, criminal restitution, or settlement;

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all issues raised in its Complaint.

Dated: March 28, 2014                    Respectfully submitted,


/s/ John R. Getsinger
John R. Getsinger        BBO #190360
19 Davis Rd Apt B-3
Acton, MA 01720-4721
Tel:   781-775-5223
jrgetsin@gmail.com

## CERTIFICATE OF SERVICE

On March 28, 2014, I e-filed this First Amended Complaint through the ECF system.

/s/ John R. Getsinger