UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>ex rel. CHARLES F. PARADISE )<br>                                                              )<br>     Plaintiff,                                           )<br>                                                              )    Civil No. 1:13-cv-11070-DJC<br>v.                                                         )<br>                                                              )<br>MASSACHUSETTS GENERAL HOSPITAL, )<br>MASSACHUSETTS GENERAL                   )<br>PHYSICIANS ORGANIZATION, INC., and  )<br>MGH OPTIMUM CARE COMMITTEE,        )<br>                                                              )<br>     Defendants                                       ) | |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff opposes Defendants' Motion to Dismiss the First Amended Complaint.

The defendants advance four principal arguments and one footnote argument[1]. First, they assert that unless an amended FCA complaint is filed under seal etc. just as the original complaint was, the Court lacks subject-matter jurisdiction to hear the amended complaint. Second, they take the position that their fraud must be detailed with exquisite particularity. Third, they reject violation of the PSDA as a basis for an FCA claim. Fourth, they dispute the standing of a relator to assert common-law fraud and unjust enrichment claims even though he was himself a victim of the fraud.

---

[1] Defendants state in their footnote 1 that the MGH Optimum Care Committee (the OCC) is misnamed as a defendant because it is not incorporated as a legal entity. The complaint alleges that OCC members place entries in patient records in the name of the OCC which are false statements in violation of the False Claims Act. Accordingly, the OCC may be sued in its common name to enforce a substantive right existing under the United States Constitution or laws. Rule 17(b)(3)(A), FRCP. The objection should be denied.

**1. AN AMENDED FCA COMPLAINT NEED NOT BE FILED UNDER SEAL ETC.**

As a preliminary, if the Court actually lacked jurisdiction over the FAC, then the filing of the FAC would have had no legal effect on the prior motion to dismiss. In that case, the Plaintiff would respectfully request leave to file an amended opposition to the original Defendants' Motion to Dismiss Complaint with a deadline of fourteen days to Friday, May 23, 2014.

However, the Defendants' first argument really has no legs, because the First Circuit has already ruled against their position in both of the District Court cases they cite.

The False Claims Act section cited by the Defendants jurisdictionally requires service of the complaint under seal and written disclosure of substantially all material evidence and information the person possesses to the Government. 31 U.S.C. § 3730(b)(2). The Act imposes no other or further requirement for sealing or disclosure and does not even mention the possibility of an amended complaint.

Plaintiff's amended complaint made no new FCA claim, a copy was in fact served on the Government, and no supplemental disclosure was required as to the allegations Defendants object to, because the relator previously disclosed the identity of the Defendants and their employees and other agents and the name and admission dates of the individual patient defrauded. These facts are sufficient for the Government to ascertain which of the primary records it already has in its custody, possession, or control are relevant to the issues in the case, such as the Defendants' Medicare Provider Agreements and their claims and amounts actually paid to them in respect of the individual patient.

On appeal, the first case concerned a Second and proferred Third Amended Complaint (SAC and TAC). *US ex rel. Wilson v. Bristol-Myers Squibb, Inc.* (CA1 April 30, 2014). The SAC added a new defendant and a new FCA claim; the TAC sought to add another Relator and yet another new FCA claim. The Appeals Court approved the judge's denial of leave to file the TAC, in effect saying that an amended complaint stating a new FCA claim must be filed under seal and served on the Government with a disclosure of evidence.

The second case concerned the dismissal of a federal complaint stating two FCA claims previously filed in a state court and a third FCA claim which was new. *US ex rel. Estate of Cunningham v. Millennium Laboratories of Cal.,* 713 F. 3d 662 (CA1 2013). The Appeals Court affirmed the dismissal as to the two claims jurisdictionally barred by the FCA's public disclosure provision but vacated the dismissal as to the new FCA claim and remanded for consideration whether it would survive dismissal under Fed.R.Civ.P. 12(b)(6) and 9(b).

Unlike the complaints in either of the cited cases, Plaintiff's FAC added no new parties and added no new FCA claims. No new FCA claim, no requirement for seal and disclosure, and no jurisdictional bar to amendment.

**2. THE ESSENCE OF THE FRAUD IS STATED WITH PARTICULARITY**

The Defendants say that the omission of certain details about the false claims presented to the Government "is fatal to his Complaint." (Def. Memo., at 8.)

As authority, they cite five cases applying Rule 9(b): two, *Karvelas* and *Gagne*, brought by employees alleging complicated fraudulent schemes by their bosses but failing to allege even a single instance of presentment of a false claim to the Government;

one, *Ge*, brought by a research doctor whose director may or may not have provided the FDA with faulty information and which failed to allege even a single instance of presentment of a false claim; the fourth, *Rivera*, brought by the Justice Department too late after the expiration of the statute of limitations period as measured by the date of the presentment of an allegedly false claim; and the fifth, *Likens*, a State bank liquidation proxy statement case brought by a dissenting minority shareholder under federal securities laws but alleging misrepresentations attributed only to all defendants lumped together as a group and none to any specific activity or person.

In contrast, in this case the fraud by denial of Medicare benefits without due process (without any process at all) was witnessed personally by the relator during the 16 days of his mother's admission to the hospital. As the complaint alleges, the simplest of services, food and water, were withheld beginning on the tenth day, but the relator was never so informed. (First Am. Compl., ¶¶ 65-73 (day by day) and ¶16 (violation of PSDA)). The complaint identifies the hospital, the Medicare patient, the dates of admission, the attending physician, the ethics committee representative, particular components of the treatment provided and treatment withheld, the violations of the PSDA, and the subsequent payment of Medicare benefits to the hospital ($9,000.00 on information and belief) and to the physicians ($1,025.05 personal knowledge of the relator based on statements of Medicare benefits received in the mail after his mother died).

The fraud? The Defendants chose to withhold treatment, chose to ignore their obligations under federal and State law, chose to sideline the relator by questioning his

authority, waited for their patient to die or be transferred, and proceeded to collect Medicare benefits for unlawfully abandoning their patient.

The details? The complaint alleges the main Medicare provider identification numbers for Defendants MGH and MGPO. What matters is that the Defendants knowingly let a Medicare patient die over her surrogate's objection while obstructing any grievance procedure and signing whatever it took to keep the Medicare payments coming. Further details are solely within the custody, possession, and control of the Defendants and their absence is not an appropriate ground for dismissal of the complaint.

The full extent of the fraud? The complaint alleges the denial of care and denial of due process was the result of the Defendants' failure to follow the PSDA rules as a routine practice of business extending to all Medicare patients. (First Am. Compl. ¶ 59, ¶¶ 81-83.) The absence of any entry or any space designated for entry of such matter in Ruth Paradise's patient record supports the inference that such matter is not included in any patient record of admission predating the admission of Ruth Paradise. Fed. R. Evid. 803(7).

## 3. VIOLATING THE PSDA VIOLATES THE FALSE CLAIMS ACT

The Defendants assert there is an absence of reported cases even considering violation of the PSDA as a violation of the FCA. They argue that assertion, if true, would somehow tend to show that violating the PSDA does not violate the False Claims Act.

Apparently the Defendants have overlooked that in reality most hospitals and physicians have simply not chosen to violate the PSDA wholesale as the complaint alleges they do. After all, the PSDA is a federal statute dating back to 1990, it imposes as

a condition of Medicare payment a very light recordkeeping burden on hospitals and physicians that promotes the most vital purposes of the Hippocratic Oath, and violation runs the risk of catastrophic sanctions if government agencies or the courts take action. So most hospitals choose to stay in material compliance and such cases simply do not arise. Except here, for some reason.

The Defendants' remaining arguments fail because they are simply a tired repeat of the failing arguments defendant Blackstone made in the *Hutcheson* case. *US ex rel. Hutcheson v. Blackstone Medical, Inc.,* 647 F. 3d 377 (CA1 2011).

First, Defendants argue the complaint must allege more facts to rise to the level of alleging a PSDA violation. The plausibility of this argument depends on their interpretation of the PSDA as imposing only one obligation on them, maintaining certain written policies and procedures. Actually, the real PSDA imposes a somewhat greater obligation than that: the PSDA provides procedural safeguards for the due process rights of patients that the Defendants continue to ignore, even in their memorandum. The PSDA provides for prominent notice of advance directives, compliance with State law which provides for inclusion of a copy of the advance directive in the patient record, disclosure of the pertinent policies and procedures immediately upon admission, etc. 42 U.S.C. § 1395cc(f). The complaint alleges the violations. (First Am. Compl. ¶ 16.)

Second, Defendants rattle the voodoo mask of "every claim for medical malpractice involving a Medicare- or Medicaid-eligible patient … transformed into a potential False Claims Act violation." (Def. Memo., at 10.) The First Circuit has already held that this argument fails. The "text of the FCA does not exhibit an intent to limit liability in this fashion." *Hutchson* at 386-87.

Under the First Circuit's framework,

> we take a broad view of what may constitute a false or fraudulent statement to avoid foreclosing FCA liability in situations that Congress intended to fall within the Act's scope. Taking this broad view does not, however, create limitless liability. Indeed, FCA liability continues to be circumscribed by strict enforcement of the Act's materiality and scienter requirements. We analyze each of Relator's claims by applying the plain language of the FCA in accordance with our decision in *Hutcheson*.

*US ex rel. Jones v. Brigham and Women's Hosp.,* 678 F. 3d 72, 85-86 (CA1 2012) (quotation marks and citations omitted).

## 4. RELATOR ENJOYS STANDING TO ASSERT CLAIMS FOR FRAUD AND UNJUST ENRICHMENT

The Defendants cite the *Walsh* case for the proposition that Charles Paradise lacks standing to seek recovery for common-law fraud and unjust enrichment. *US ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141 (D.Mass. 2000). The *Walsh* case was brought by a relator who was the chief financial officer of the hospital. No fraud was worked on him personally, so his standing was solely derivative of the Government interest on a partial assignment theory. *Walsh*, at 149, citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 US 765, 773 (2000).

In contrast, Paradise does have a dog in this fight: he was the patient's son and her duly designated health care proxy. (First Am. Compl. ¶72.) The defendants injured him directly and personally by failing to include prominent notice of his status in the medical record, by failing to make the disclosures to him required by federal statute, by failing to provide him with due process required by the Medicare statute, the FAR, and the US Constitution, and by depriving him of his right to consent or not to proposed withholding of treatment for his mother. As a result, he claims, his mother died prematurely from the

withholding by defendants of hydration and nutrition; if he had been accorded due process, he would have been proffered a timely opportunity to contest the Defendants' decision to withhold treatment. Accordingly, Mr. Paradise has standing independent of the partial assignment theory to seek recovery for common-law fraud and unjust enrichment.

**NEMO JUDEX IN CAUSA SUA: THE RIGHT TO FAIR PROCESS**

The complaint seeks enforcement of the Patient Self-Determination Act. In effect, the defendants' motion to dismiss the complaint invites the federal courts to decline jurisdiction over decisions to withhold Medicare benefits for life support even when patients object. Their defense is the familiar one of reasonable medical judgment. That it fails and should fail in the present case reflects the fact that circumstances of medical decision making have changed in a fundamental way with the introduction of legally required Medicare and Medicaid cost containment measures in place of the previous regime of fee for service. Hospitals, physicians, and others have accepted the benefits and the burdens of delegated federal authority to make decisions to grant or withhold Medicare benefits. "Men must turn square corners when they deal with the Government." *Rock Island A. & L. R. Co. v. United States*, 254 U.S. 141, 143, 41 S. Ct. 55, 56, 65 L. Ed. 188 (1920). When the decision is to withhold life support and the patient or surrogate objects, due process requires a fair hearing at the very least. *Goldberg v. Kelly*, 397 US 254 (1970).

In cases of medical malpractice, the defense of reasonable medical judgment has been long accepted, based on the then reasonable belief that physicians by their very nature could be counted upon to act in the interest of their patients. But hidden behind the

curtain were the twin incentives of fee for service on the one hand and nonliability for malpractice in pro bono cases on the other. Under fee for service, there was no built-in conflict of interest.

The central problem is that cost containment measures have changed the game by introducing incentives for hospitals and physicians to withhold treatment they would previously had no incentive to withhold. They have been captured by an inherent conflict of interest. And in this case, it went too far.

When medicine was fee for service, there was never a question except in isolated cases whether a physician acted in the best interest of a patient. The patient's interest and the physician's interests were aligned. The recent advent of cost containment measures, such as HMO's and Medicare utilization reviews, however, disturbed the ethical balance and put the patient's interest and the physician's interest in conflict, however slight.

How important is the principle that no one should judge their own case? Prominently and centrally placed, chiseled in stone over the formal front door of Harvard Law School, is the axiom "Non sub homine sed sub Deo et lege." It is the school's formal entrance. It conveys the first and most basic doctrine of law to students and visitors. It is prominently placed because it is vitally important in concept and in practice. Sir Edward Coke attributes this to Bracton (fol.6b, 12 *Coke's Reports* 63) in the conference of James the First and the Judges of England. The outcome of this conference was that cases were to be decided by the courts and not by the King in person. Quotations in the Langdell Reading Room, http://www.law.harvard.edu/library/about/history/reading-room-quotations.html (last visited May 9, 2014).

Just as the King himself was disqualified from deciding cases—to prevent a conflict of interest, however slight, from distorting the law—a physician is disqualified from deciding cases of life, liberty and death without oversight. *Dr. Bonham's Case,* 77 Eng. Rep. 638 (1609); *Tumey v. Ohio,* 273 US 510, 524 (1927) (the slightest pecuniary interest of any officer, judicial or quasi-judicial, in the resolving of the subject matter which he was to decide, renders the decision voidable at law. Bonham's Case); Louis L. Jaffe, *Judicial Review: Constitutional and Jurisdictional Fact*, 70 HARVARD LAW REVIEW 953, 953 and 963 (1957) (A tribunal of limited jurisdiction should not be the final judge of its exercise of power; it should be subject to the control of the courts of more general jurisdiction.).

In Massachusetts, "we reject the approach adopted by the New Jersey Supreme Court in the *Quinlan* case of entrusting the decision whether to continue artificial life support to the patient's guardian, family, attending doctors, and hospital 'ethics committee.'" *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 758 (1977) (footnote omitted).

Given the nonreviewability of agency nonenforcement policies, such as CMS's failure to enforce the PSDA and the DOJ's nonintervention in this case, it seems that nonenforcement would ordinarily be the most powerful tool for agency modification of statutory norms. The addition of independent citizen enforcement by means of the FCA changes that calculus fundamentally. As Judge J. Skelly Wright observed in another context of citizen judicial empowerment, "[the courts'] duty, in short, is to see that important legislative purposes, heralded in the halls of Congress, are not lost or

10

misdirected in the vast hallways of the federal bureaucracy." *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n,* 449 F.2d 1109, 1111 (D.C. Cir. 1971).

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss First Amended Complaint.

Dated: May 9, 2014                                        CHARLES F. PARADISE

By his attorney,

/s/ John R. Getsinger
John R. Getsinger (BBO #190360)
19 Davis Rd Apt B-3
Acton, MA 01720-4721
781-775-5223
jrgetsin@gmail.com

CERTIFICATE OF SERVICE

On May 9, 2014, I e-filed this document through CM/ECS.

/s/ John R. Getsinger

11